## Hays' Estate.  Allegheny National Bank's Appeal.

*Equity—Maxims—Clean hands—Fraud.*

The maxim that " he who comes into a court of equity must come with clean hands," considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction.

*Judicial sale—Combination to prevent bidding—Public policy—Subrogation—Equity.*

A contract between two or more lien creditors, by which one of them is not to bid at a judicial sale, made without the knowledge and consent of the defendant, is contrary to public policy and void.

A lien creditor who has entered into such a contract is not entitled to be subrogated to the rights of the defendant as against third parties whose interests have been affected by the lessened competition in the bidding.

Argued Nov. 13, 1893.  Appeal, No. 306, Oct. T., 1893, by The Allegheny National Bank, from decree of O. C. Allegheny Co., Jan. T., 1893, No. 142, on petition for citation.  Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Petition for citation.

The record showed that on Feb. 13, 1893, a petition by the Allegheny Nat. Bank was presented and citation awarded against Lydia C. McCutcheon, Margaret McCandless and Mary Eva Hays, children of Wm. B. Hays, deceased, to appear and show cause why the petitioner should not be subrogated to the lien of certain legacies against their respective purparts.

The opinion of the court below was as follows, by HAW-KINS, P. J.:

" Wm. B. Hays gave the residue of his estate to his five children, Wm. B., Curtis H., Lyda C. (now Mrs. McCutcheon), Margaret (now Mrs. McCandless), and Mary E. (now Mrs. Stewart), subject to the payment of legacies amounting to $45,000, and the share of Wm. B. Hays, Jr., to the additional sum of $40,000.  C. H. Hays, having first given a mortgage of $7,000 to the estate, sold his undivided interest in the land de-

vised to Wm. B. Hays, Jr., from whom he took a mortgage for the balance of purchase money, which was afterward assigned to D. R. McIntire, and by him to said bank. Proceedings in partition having been subsequently instituted, these two shares were allotted to Wm. B. Hays, Jr., and thereupon Wm. B. Hays, Jr., gave an additional mortgage for $15,000 to the Allegheny National Bank, the present petitioners.

" The personal estate left by decedent was more than sufficient to have paid the testamentary charges in full, but was wasted by Wm. B. Hays, Jr., Exr., who became insolvent and was discharged from the trust. The Allegheny National Bank thereupon foreclosed its mortgage and sold the shares allotted to Wm. B. Hays, Jr., at marshal's sale. Pending the sale it became the purchaser of the C. H. Hays purchase money mortgage. The proceeds of sale were appropriated on account of the testamentary charges, and the bank thereupon asked to be subrogated to the rights of the legatees, as fully set forth in the petition.

" There were two actively competing bidders when the Wm. B. Hays, Jr., property was first offered by the marshal : The Allegheny National Bank, which controlled the writ, and D. R. McIntire, assignee of the purchase money mortgage. But while the bidding was going on, Mr. Dickey, attorney for the bank, stated to Mr. Bleakley, attorney for McIntire, that he wanted to have an adjournment and would make an agreement to pay the McIntire claim. Mr. Bleakley consented, an adjournment was had, and before the next day fixed for sale, an agreement was made by which the bank was to pay McIntire the amount of his mortgage and his attorney was not to bid against the bank ; the bank was to bid in the property, and after it had paid the amount due McIntire out of the proceeds of re-sale by them, and also the amount due the bank by Wm. B. Hays, Jr., the surplus was to be divided between the bank and McIntire in proportion to their respective claims. There was no public assignment of the McIntire mortgage, the understanding being that no one but the parties to the agreement was to know of the arrangement. Mr. Bleakley was to, and did, continue representing Mr. McIntire as though he was a competitor, but was not to bid actively against the bank. The purpose of the parties was to make an arrangement by which

they could make their claims and get the property as cheap as possible. The McIntire mortgage was paid by cashier's check of the Allegheny National Bank. The bank bid on the property and bought parts of it at the adjourned sale. These respondents and the administrator were also present or represented, and bid on and bought parts of the property. The arrangement between the Allegheny National Bank and McIntire was unknown to them until within a few days of the last hearing in the present proceeding.

" While a court of equity may act upon the conscience of a defendant and force him to do right and justice, it will never thus interfere on behalf of a plaintiff whose own conduct in' connection with the same matter or transaction had been unconscientious, or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. It endeavors to promote and enforce justice, good faith, uprightness, fairness and conscientiousness on the part of those who occupy a defensive position in judicial controversies ; but it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim, ' He who comes into a court of equity must come with clean hands.' The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction. With this limitation, ' it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of rights and remedies.' Pomeroy's Eq. Jur., secs. 398, 399.

" The application of this principle to the present case is plain. Had the case rested on the petition and demurrer, these respondents must, as already shown, have been forced to do right and justice to petitioner by making contribution, but the proof of a secret arrangement, set up in the answer, by which a competing bidder was silenced, introduced a new element and made a radical change in the relations of the parties. It is settled in this state that ' a contract between two or more lien creditors,

by which one of them is not to bid at a judicial sale, made without the knowledge and consent of the defendant, is contrary to public policy and void.' The reasons for this rule are concisely given in Barton v. Benson, 126 Pa. 431, a case in which an attempt was made to enforce a contract similar to that shown here, as between the parties to it. ' The court below held that the contract declared upon was against public policy, and therefore void. It is true that a somewhat similar contract was sustained in Maffet v. Ijams, 103 Pa. 266. In that case, however, it appeared affirmatively that the agreement was known and assented to by the defendant in the execution and all the lien creditors who were or could be affected by it. In the case in hand, the defendant was dead, and he could not, of course, assent or dissent. But his heirs stood in his shoes, and there was no evidence that they ever knew of the arrangement. It is true, it was alleged that the property was not worth the liens and no one could have been injured. We cannot sustain the agreement upon this narrow ground. The allegation may be true, but it would introduce an uncertain element into judicial sales, were we to sustain such an agreement upon the ground that the property was not worth the liens. As a general rule, the defendant in an execution, or those who stand in his place, have an interest in making the property bring its full value. Hence, an agreement by which persons are debarred from bidding, must have the sanction of the defendant. In Slingluff v. Eckel, 24 Pa. 472, it was held that an agreement made at sheriff's sale of real estate to pay the judgment of another, if the latter would not bid, the former being permitted to purchase the property at the sale, was fraudulent as to the debtor or his creditors, and could not be enforced by suit.' That the petitioner in this case made use of his control of the judicial process upon which the sale was made, for the purpose of silencing his competitor, was an aggravation of his misconduct. What was the extent of the injury to respondents resulting from this secret arrangement is immaterial and impossible to state ; it is enough that the misconduct of petitioner in ' some measure affected the equitable relations subsisting between the two parties and arising out of the transaction.' That there was a loss to the respondents must be conclusively presumed. The value of defendant's property must necessarily

have been increased by every additional bidder. For every dollar's increase, the extent of respondents' liability would have been diminished, and satisfaction of petitioner's claim out of Wm. B. Hays, Jr.'s property, which was the primary fund, would have extinguished their liability. The extent of the loss is, in the nature of the case, incapable of ascertainment. The consequent uncertainty was caused by petitioner's illegal act and must be taken most strongly against it. But even assuming that the extent of loss could be measured, the fraud on respondents' rights remains and vitiates all that follows in its train.

" The connection between the secret arrangement and the claim made here is obvious. Petitioner is claiming because enough was not realized out of the primary fund to satisfy its mortgagee. The amount, if not the fact, of claim is the direct result of the illegal arrangement made by petitioner in fraud of respondents' rights and to respondents' injury. He who has done iniquity cannot have equity."

Exceptions to the findings and decree were dismissed, the court filing the following opinion :

" The Pennsylvania authorities, cited for the first time on the argument of these exceptions by exceptant, are not in conflict with the decision of this court in dismissing the petition for subrogation. In all of them except Smull v. Jones, 6 W. & S. 122, it expressly appears that the joint bidding was ' open and fair,' and as in Smull v. Jones secrecy was not mentioned as a fact in the case, that element was probably wanting there also. No one doubts, nor is there reason to doubt, the validity of such bidding. In the case of Barton v. Benson, 126 Pa. 431, upon which the decision of this court was rested, it is distinctly recognized; but that, and the cases generally, stamp contracts made without the knowledge of defendants between lien creditors by which one or more is debarred from bidding at a judicial sale, as against public policy and void. The result of the authorities is thus stated in 2 Pomeroy's Eq. 934: ' Where property is to be sold at public auction, and especially where the sale is by order of court, or is made in the course of governmental administration, a secret combination among the persons interested in bidding, whereby they stipulate to refrain from bidding in order to prevent competition and to lower the

selling price of the property, is illegal, according to the uniform course of decision in this country. The stipulations of the buyer to pay compensation to the others in consideration of their promise not to bid, or to share the property with them, are void, and the sale itself, made as the result of the combination, is also tainted with the fraud, and will be set aside at the suit of the vendor.'  See also Greenhood on Public Policy, 185.

" The bidding in the present case was not ' open and fair,' but was admittedly made in pursuance of a secret arrangement by which this petitioner silenced a competing bidder in the only matter out of which its present claim of subrogation arises. The purpose and necessary tendency of this combination was to depress the value of the property, to petitioner's advantage, and these respondents' injury.  Competition is the life of judicial as of other sales, and there is no reliable measure by which to estimate the result of it.  Viewing this combination in the light of public policy it is obviously incompetent to show that there was no injury done, for the effect must be to introduce an uncertain element into judicial sales, Barton v. Benson, supra; and condone prohibited motives: Gibbs v. Smith 115 Mass. 592.  If the transaction be void as being against public policy it would be absurd to hold that the wrongdoer can thus evade its effect.  Nor, viewing the combination to stifle bidding as fraudulent, is such testimony competent. Fraud admitted implies injury such as will stay the hand of a court of equity.  ' Whatever be the nature of plaintiff's claim and of the relief which he seeks, if his claim grows out of or depends upon, or is inseparably connected with, his own prior fraud, a court of equity will in general deny him relief, and will leave him to whatever remedies and defences at law he may have : '  1 Pom. Eq., sec. 401."

*Errors assigned* were in overruling exceptions, quoting them.

*West McMurray*, *Shiras & Dickey* with him, for appellants, cited : Miller's Ap., 119 Pa. 631; Hess's Est., 69 Pa. 272, Brotzman's Ap., 119 Pa. 645; 1 Rhone, O. C. Pr. 584; Phippen v. Stickney, 3 Metc. 384; Bigelow on Frauds, 142; Hunt v. Elliott, 80 Ind. 250; Myer v. Yesser, 32 Ind. 294; Story's Eq. § 64, note *e*; Smull v. Jones, 1 W. & S. 128; Herman on Ex. 317; Com. v. Shollenberger, 156 Pa. 201; Kearney v.

Taylor, 15 How. 521; Omar v. Rothermel, 98 Pa. 300; Abbey
v. Dewey, 25 Pa. 416; Lewis's Ap., 67 Pa. 166; Sharp v.
Tayler, 2 Phil. Ch. 801; Brooks v. Martin, 2 Wall. 81; Wat-
son's Ap., 90 Pa. 426; McCormick v. Irwin, 35 Pa. 111; Do-
vey's Ap., 97 Pa. 153.

*Dalzell, Scott & Gordon,* for appellees, not heard, cited: For-
est Oil Co.'s Ap., 118 Pa. 145; Fink v. Mahaffy, 8 Watts, 384;
Sugden on Vendors, ch. 1, § 1, p. 5; Story's Eq. Jur., sec. 293;
Jones v. Caswell, 3 Johns. Cas. 30; Smith v. Greenlee, 2 Dev.
128; Bracket v. Wyman, 48 N. Y. 667; Slingluff v. Eckel, 24
Pa. 472; Thompson v. Davis, 13 Johns. 113; Phippen v. Stick-
ney, 3 Metc. 385; Bunts v. Cole, 7 Black, 265; Barton v. Ben-
son, 126 Pa. 433; Pomeroy's Eq. § 404; Knouf's Ap., 91 Pa.
82; Sheldon, Subrogation, §§ 2–4; 2 Beach, Eq. Jur. §§ 798,
801; McGinnis's Ap., 16 Pa. 445; Mosier's Ap., 56 Pa. 76;
Webster's Ap., 86 Pa. 412; Evans v. Halleck, 83 Mo. 377;
Bunn v. Lindsay, 95 Mo. 250; Lloyd v. Galbraith, 32 Pa. 108;
Kendall's Case, 17 Ves. 514; Dolphin v. Aylward, L. R. 4 H.
of L. 503; Sanders v. Cook, 22 Ind. 436; Dorr v. Shaw, 4
Johns. Ch. 17; Robeson's Ap., 117 Pa. 635; Neff v. Miller, 8 Pa.
347; Aldrich v. Cooper, White & Tudor's L. Cas. Eq., 4 Am.
ed., vol. 2, part 1, p. 228; Armstrong v. Walker, 150 Pa. 585;
McIntyre v. Velte, 153 Pa. 350; Allen v. Oxnard, 152 Pa.
621; Curtis v. Root, 20 Ill. 57; Thomas' Ap., 30 Pa. 278;
Stewart v. Allegheny Nat. Bank, 101 Pa. 342; Murray v.
Weigle, 118 Pa. 159; Navassa Guano v. Richardson, 26 S. C.
412; Agnew v. Renwick, 27 S. C. 562; Foster's Ap., 3 Pa. 79.

PER CURIAM, December 30, 1893:

All the facts necessary to a proper understanding of this case
are clearly and concisely set forth in the statement and opinions
of the learned president of the orphans' court, dismissing ap-
pellant's petition for subrogation, etc. The questions involved
have been so fully considered and so satisfactorily disposed of
by him in said opinions that we adopt them and affirm the de-
cree thereon.

Decree affirmed and appeal dismissed with costs to be paid
by appellant.